**Bruce D. SAMUELSON, Plaintiff,**

v.

**MID–ATLANTIC REALTY CO., INC., Defendant.**

**Civil Action No. 96–235 MMS.**

United States District Court, D. Delaware.

Argued Nov. 20, 1996.

Decided Nov. 27, 1996.

---

John S. Whitelaw, of Community Legal Aid Society, Inc., Wilmington, DE, for plaintiff.

David Roeberg, of Roeberg, Moore & Associates, P.A., and Francis J. Jones, Jr., of Morris, James, Hitchens & Williams, Wilmington, DE, for defendant.

### OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

## I. INTRODUCTION

Plaintiff Bruce D. Samuelson ("plaintiff" or "Samuelson") has filed suit against defendant Mid–Atlantic Realty Co., Inc. ("defendant" or "Mid–Atlantic"), alleging he was subjected to discrimination on the basis of his mental handicap, in violation of the Fair Housing Amendments Act, 42 U.S.C. § 3601, *et seq.* ("the FHAA"), the Delaware Fair Housing Act, DEL.CODE ANN. tit. 6, § 4600, *et seq.* (1993) ("the DFHA"), and the Delaware Landlord Tenant Code, DEL.CODE ANN. tit. 25, § 5509(b)(2) (1989), *as amended,* tit. 25, § 5314(b)(2) (1996). This Court has jurisdiction pursuant to 42 U.S.C. § 3613, and 28 U.S.C. §§ 1331 and 1343(a)(3).

The dispute arises from Samuelson's early termination of his lease because of his deteriorating mental condition. Samuelson argues, in Counts I & III of his complaint, that Mid–Atlantic's assessment of rent and late charges for the remaining term of his lease constitutes a failure to make reasonable accommodations for his handicap in violation of the FHAA. In Count II, Samuelson alleges Mid–Atlantic's conduct violates a provision of the Delaware Landlord Tenant Code which permits a tenant to cancel a lease because of "serious illness." Samuelson seeks: (1) a declaration that Mid–Atlantic has violated

the FHAA, DFHA, and the Delaware Landlord Tenant Code; (2) compensatory and punitive damages; and (3) an injunction preventing Mid–Atlantic from taking any action to collect fees or late charges.

Mid–Atlantic answered and filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons below, Mid–Atlantic's motion will be denied.

## II. FACTS

On April 25, 1995, Samuelson entered into a one-year lease with Mid–Atlantic for an apartment on Lancaster Pike in Wilmington, Delaware. Docket Index ("D.I. 2") at 4, ¶ 17. Rent was $395.00 each month; of this total, Samuelson paid $18.00 and the New Castle County Department of Community Development and Housing ("NCCDH"), through the United States Department of Housing and Urban Development ("HUD"), paid Mid–Atlantic the remaining $377.00. Id. at ¶¶ 18, 19. Samuelson also paid Mid–Atlantic a one-time security deposit of $106.00. Id. at ¶ 20.

Samuelson did not spend much time in his new abode. He suffers from an undisclosed, apparently crippling, mental impairment. Id. at ¶ 16. As a result, he cannot work and he receives Supplemental Security Income ("SSI") and social security benefits. Id. Three days after he moved into the apartment, his condition seriously deteriorated. He was hospitalized from April 28 to May 15, 1995. Id. at ¶ 21. His psychiatrist determined his mental condition made it simply unsafe for him to continue to live in the apartment. Id. at ¶ 22. Samuelson's psychiatrist expressed this diagnosis in writing to Mid–Atlantic, and, on June 15, 1995, Samuelson sent a letter informing Mid–Atlantic he wished to terminate his lease effective July 31, 1995, pursuant to a provision in the Delaware Landlord Tenant Code allowing a tenant to terminate his lease early because of "serious illness." D.I. 2 at 5, ¶ 24.[1]

Samuelson cleaned his apartment and returned the keys to Mid–Atlantic. D.I. 2 at 5, ¶ 25. He left the premises on July 31, 1995, never to return. On August 18, Samuelson's father asked Mid–Atlantic to return the $106.00 security deposit. Id. at ¶ 26. Mid–Atlantic's response was decidedly icy—it denied Samuelson a refund for his security deposit and, on September 9, presented him with a bill for $4,307.35.[2] Id. Mid–Atlantic claimed Samuelson owed it for the remaining term of the lease, plus sundry charges for cleaning the apartment and reletting it to a new tenant. Id. at ¶ 27. Samuelson refused to pay and filed suit in this Court. Mid–Atlantic answered and filed a motion to dismiss, the subject of this opinion.

## III. DISCUSSION

### A. Standard of Review—Motion to Dismiss

In reviewing a motion to dismiss, the Court must accept plaintiff's allegations as true and construe those allegations in a light most favorable to the plaintiff. *Dykes v. Southeastern Pennsylvania Transportation Authority*, 68 F.3d 1564, 1566 n. 1 (3d Cir. 1995) (citing *Wisniewski v. Johns Manville Corp.*, 759 F.2d 271, 273 (3d Cir.1985)), *cert. denied*, —— U.S. ——, 116 S.Ct. 1434, 134 L.Ed.2d 556 (1996). Dismissal is appropriate "only if it is clear that no relief could be

---

1. At argument, counsel for Mid–Atlantic raised for the first time the contention that Mid–Atlantic never received the letter. Defense counsel further stated that had the letter been received,

2. This amount was composed of the following charges:

| | | |
|---|---|---|
| A. | Rent from August 1995 through April 1996 | $3,555.00 |
| B. | Late charges at $35.00 per month | 315.00 |
| C. | Cleaning | 65.00 |
| D. | Reletting Fee | 197.50 |
| E. | Labor to re-rent unit at $23.50/hour | 70.50 |
| F. | Carpet shampoo | 90.00 |
| G. | Parts to renovate unit | 14.35 |
| | TOTAL: | $4,307.35 |

D.I. 2 at 5, ¶ 27.

Mid–Atlantic would never have sent Samuelson the September 9 bill for $4,307.35. Since this was not in the record, and is a disputed issue of fact, it does not affect the analysis of this motion.

granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)). As the Supreme Court has written, "the issue is not whether a plaintiff will ultimately prevail" but whether a plaintiff is entitled to legal relief if everything alleged in the complaint is true. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). With these standards in mind, the Court looks only to the facts as alleged in Samuelson's complaint and accepts them as true.

## B. The FHAA[3]

Congress passed the original Fair Housing Act ("FHA") as Title VIII of the Civil Rights Act of 1968. The FHAA of 1988 expanded the FHA by including handicapped persons in those classes protected from discrimination in housing. H.R.Rep. No. 711, 100th Cong., 2d Sess., at 17 (1988), 1988 U.S.Code Cong. & Admin.News pp. 2173, 2178. The FHAA makes it unlawful to either: (1) "discriminate in the sale or rental [of], or to otherwise make unavailable or deny, a dwelling[,]" to a handicapped person, 42 U.S.C. § 3604(f)(1); or (2) "discriminate against any [handicapped] person in the terms, conditions, or privileges of sale or rental of a dwelling[,]" 42 U.S.C. § 3604(f)(2).

Discrimination includes "a refusal to make *reasonable accommodations* in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person *equal opportunity to use and enjoy a dwelling.*" 42 U.S.C. § 3604(f)(3)(B) (emphasis added). Under this provision, "affirmative steps are required to change rules or practices if [such steps]

are necessary to allow a person with a disability an opportunity to live in the community." *Horizon House Developmental Servs., Inc. v. Township of Upper Southampton,* 804 F.Supp. 683, 699 (E.D.Pa.1992), *aff'd mem.,* 995 F.2d 217 (3d Cir.1993). Further, a reasonable accommodation "means changing some rule that is generally applicable to everyone so as to make its burden less onerous on the handicapped individual." *Oxford House, Inc. v. Township of Cherry Hill,* 799 F.Supp. 450, 462 n. 25 (D.N.J.1992); *see Alliance for the Mentally Ill v. City of Naperville,* 923 F.Supp. 1057, 1078 (N.D.Ill.1996). This case presents two intertwined novel issues of law under section 3604(f)(2) of the FHAA: (1) whether the manner in which a lease may be terminated is a "term, condition, or privilege" of the lease agreement; and (2) if so, whether a refusal to reasonably accommodate a handicapped individual who needs to alter that "term, condition, or privilege" by terminating his lease early interferes with that individual's opportunity to "use and enjoy" his dwelling.

The parties' positions are clear. Samuelson does not argue Mid–Atlantic has made his apartment "unavailable" to him. Rather, he argues, Mid–Atlantic engaged in the second type of discrimination outlawed by the FHAA—discrimination in the "terms, conditions and privileges" of rental. 42 U.S.C. § 3604(f)(2). According to Samuelson, the manner in which a rental agreement can be terminated constitutes a "term, condition, or privilege" of rental. Samuelson submits Mid–Atlantic refused to reasonably accommodate him by assessing late charges and penalties when he was forced to terminate his lease early because of his handicap.[4] This lack of a reasonable accommodation di-

---

3. The Delaware Fair Housing Act ("DFHA"), like its federal counterpart, reflects a legislative policy of eliminating discrimination in rental housing on the basis of handicap. Del.Code Ann. tit. 6, § 4601. Further, the language of the applicable provision of the FHAA, 42 U.S.C. § 3604(f)(3)(B), is identical to the language of the DFHA, Del.Code Ann. tit. 6, § 4603(b)(6). Although the Supreme Court of Delaware has not interpreted this provision, both parties agree, and logic dictates, that it would employ the same reasoning as the federal courts have used in interpreting the FHAA. Therefore, this Court's

analysis of Samuelson's claim under the FHAA applies with equal force to his claim under the DFHA.

4. Under the FHAA, the term "handicap" includes "a physical or mental impairment which substantially limits one or more of such person's major life activities." 42 U.S.C. § 3602(h)(1). For purposes of a motion to dismiss, this Court assumes Samuelson's mental condition qualifies him as handicapped under the FHAA.

rectly affected his "use and enjoyment" of a dwelling, Samuelson asserts; thus, Mid–Atlantic has violated the FHAA.

Mid–Atlantic, on the other hand, characterizes this as a very pedestrian landlord-tenant squabble that does not implicate the FHAA. A failure to provide a reasonable accommodation only becomes unlawful discrimination when it impairs a person's use and enjoyment of a dwelling. 42 U.S.C. § 3604(f)(3)(B). Late charges were not asserted until September 9, 1995, well after Samuelson had unilaterally terminated his lease as of July 31, 1996.[5] According to Mid–Atlantic, Samuelson cannot successfully argue the September 9 charges denied him an equal opportunity to the use and enjoyment of his apartment when he had voluntarily abandoned his opportunity to use and enjoy it some thirty-odd days earlier. It follows, Mid–Atlantic urges, that Mid–Atlantic did not engage in unlawful discrimination as it is defined under the FHAA. Finally, Mid–Atlantic posits, even if it engaged in discrimination, its discrimination did not interfere with the "terms, conditions, or privileges" of Samuelson's rental agreement, 42 U.S.C. § 3604(f)(2); again, Mid–Atlantic stresses, early, unilateral termination is not a term, condition or privilege of the rental agreement. Thus, Mid–Atlantic urges the Court to dismiss this case because it belongs, if at all, in state court.

Mid–Atlantic relies on one case—*Growth Horizons, Inc. v. Delaware County, Pa.*, 983 F.2d 1277 (3d Cir.1993)—to support its motion to dismiss. In *Growth Horizons*, a corporation which provided Community Living Arrangements ("CLA's") for retarded individuals signed a contract with Delaware County. *Id.* at 1279. Under the contract, the corporation would lease and renovate four sites within the County to provide CLA's for fifteen retarded individuals. *Id.* After building a CLA at one of the four sites, Delaware County canceled the contract. *Id.* The corporation then brought suit under the FHAA, alleging the County was contractually obligated to assume the corporation's in-

terests in the sites. *Id.* The corporation also alleged the County refused to assume the leases because of political pressure emanating from bias against the handicapped. *Id.*

The Third Circuit Court of Appeals held the corporation had not stated a claim under the FHAA. The court held the County had not made housing "unavailable" to retarded individuals simply because it had refused to pay for that housing. *Id.* at 1283. In a footnote, the *Growth Horizons* court further noted that "[t]he County's refusal to assume the leases … plainly does not involve 'the terms, conditions, or privileges of sale or rental'. . . ." *Id.* at 1284 n. 12. Similarly, Mid–Atlantic argues, the fact that Mid–Atlantic first refused to honor an early termination of Samuelson's obligations under the lease and then assessed rent and other charges did not render the apartment unavailable to Samuelson, nor did it interfere with his ability to use and enjoy the apartment.

But *Growth Horizons* is readily distinguishable from this case. The *Growth Horizons* court acknowledged that Congress was concerned with protecting the housing choices of the handicapped under the FHAA. *Id.* at 1283. But Congress was most concerned, the court wrote, with eradicating discrimination by "persons in a position to frustrate such choices—primarily, at least, those who own the property of choice and their representatives." *Id.* The corporation in *Growth Horizons*, however, was challenging the conduct of a public agency which sponsored housing for the handicapped. *Id.* "Nothing in the text or legislative history" of the FHAA, reasoned the court, suggests Congress intended such conduct to be within the parameters of the FHAA; thus, "a public agency's refusal to pay for a given housing unit, even if influenced by bias against the handicapped, does not violate § 3604(f)(1)." *Id.* at 1284.

This case does not present an attempt to hold a public agency liable for an allegedly discriminatory decision regarding how it al-

---

5. This is the date Samuelson gave to Mid–Atlantic in his June 15 letter as the date he wanted to terminate his lease.

locates funds. Rather, it concerns the principal evil that the *Growth Horizons* court recognized the FHAA was intended to remedy—allegedly biased conduct and decision-making by "those who own the property of choice and their representatives." *Id.* at 1283. Further, a refusal to assume leases—which, in *Growth Horizons,* did not implicate the "terms, conditions, or privileges" of a lease—cannot be properly analogized to a refusal to allow early termination of a lease.

It is beyond cavil that the manner in which a rental agreement can be terminated constitutes a term, condition, or privilege of the rental agreement itself. The FHAA contemplates that events associated with the departure of a tenant are conditions of a rental agreement. For example, the FHAA allows an agreement by a tenant to restore the interior of the premises to the condition that existed before reasonable architectural modifications. 42 U.S.C. § 3604(f)(3)(A). The regulations also provide that a landlord may not impose higher security deposits on handicapped tenants. 24 C.F.R. § 100.203(a). Keeping in mind a lease is a contract, the duration of the contract, and how the obligations of a party under the contract can be fulfilled, are terms of the contract itself.

A much closer call is whether Mid–Atlantic has discriminated at all. A failure to reasonably accommodate a handicapped person is considered unlawful discrimination only if an accommodation is "necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). *United States v. California Mobile Home Park Management Co.,* 29 F.3d 1413 (9th Cir. 1994), is instructive on this question. In *California Mobile Home Park,* the Ninth Circuit Court of Appeals considered "whether the duty imposed under the FHAA to make 'reasonable accommodations in rules' on behalf of handicapped persons may require a landlord to waive, in a given instance, fees generally applicable to all residents." 29 F.3d at 1414. The management company in *California Mobile Home Park* had imposed a fee, for the presence of long-term guests and for guest parking, on a handicapped resident who needed a home health care aide. *Id.* at 1415. Although the fee

applied to all residents, the court held the refusal to waive generally applicable fees for a handicapped resident could state a claim under the FHAA. *Id.* at 1416. Explaining that "the history of the FHAA clearly establishes that Congress anticipated that landlords would have to shoulder certain costs involved, so long as they are not unduly burdensome[,]" the court cautioned against premature dismissal of FHAA challenges to fees imposed by landlords on handicapped tenants. *Id.* The inquiry as to whether a landlord must reasonably accommodate a tenant by waiving generally applicable fees is "highly fact-specific, requiring case-by-case determination." *Id.* at 1418 (citations omitted). Further, a court should examine factors including "the amount of fees imposed, the relationship between the amount of fees and the overall housing cost, the proportion of other tenants paying such fees, the importance of the fees to the landlord's overall revenues, and the importance of the fee waiver to the handicapped tenant." *Id.*

The fees and penalties presented here are more akin to the generally applicable fees in *California Mobile Home Park* than the funding decision in *Growth Horizons.* It is clear that generally applicable fees—as in *California Mobile Home Park* and here—can interfere with the use and enjoyment of housing by the handicapped. *See* H.R.Rep. No. 711, at 25. In fact, the FHAA regulations describe just such a scenario as an example of unlawful discrimination:

Progress Gardens is a 300 unit apartment complex with 450 parking spaces which are available to tenants and guests of Progress Gardens on a "first come first served" basis. John applies for housing in Progress Gardens. John is mobility impaired and is unable to walk more than a short distance and therefore requests that a parking space near his unit be reserved for him so he will not have to walk very far to get to his apartment. It is a violation of s 100.204 for the owner or manager of Progress Gardens to refuse to make this accommodation. Without a reserved space, John might be unable to live in Progress Gardens at all or, when he has to park in a space far from his unit, might have great difficulty getting from his car to his apart-

ment unit. The accommodation therefore is necessary to afford John an equal opportunity to use and enjoy a dwelling. The accommodation is reasonable because it is feasible and practical under the circumstances.

24 C.F.R. § 100.204(b). The factual scenarios in *California Mobile Home Park* and in the FHAA regulations both involve facially neutral policies that could adversely affect the handicapped. So, too, is the policy at issue here—the refusal to allow early termination of a lease. Further, and significantly, Samuelson was still a tenant when he effectively requested an accommodation from Mid–Atlantic's lease termination policy on June 15. Thus, this case is not materially different from *California Mobile Home Park* or the example in the FHAA regulations.

Finally, courts are reminded to give the FHAA a "generous construction," *City of Edmonds v. Oxford House, Inc.,* — U.S. —, — n. 11, 115 S.Ct. 1776, 1783 n. 11, 131 L.Ed.2d 801 (1995) (citation omitted), and Mid–Atlantic's constricted reading of "terms, conditions, or privileges" and "use and enjoy" would squeeze the vitality from the FHAA. At oral argument, counsel for Mid–Atlantic conceded that if a tenant had asked "up front"—that is, before he signed the lease—for an accommodation in the termination procedure, and that request had been denied, then it is likely the landlord had violated the FHAA. But, according to Mid–Atlantic, so long as this same scenario occurs at the "back end" of the lease—after the lease has already been signed and early termination is both necessary and imminent—there is no FHAA violation. This position—despite its superficial appeal—can only be described as a breathtaking display of formalism.

▉ In both instances, the handicapped tenant's use and enjoyment of a dwelling is impaired. Further, given Mid–Atlantic's temporal limitation on the FHAA, landlords could read and circumvent the FHAA at their leisure; to discourage handicapped ten-

ants, they need only pile fees and surcharges on the "back end" of the lease. To elaborate, landlords could impose exorbitant lease termination fees on only disabled tenants; courts and governmental agencies would be powerless to enjoin such invidious discrimination, so long as the penalty was imposed *after* the tenant had moved out, rather than while the tenant was still residing in the apartment.[6] This would render the FHAA toothless. As this circuit has recognized, the enactment of the FHAA was "a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream." *Hovsons, Inc. v. Township of Brick,* 89 F.3d 1096, 1105 (3d Cir.1996) (quoting *Helen L. v. DiDario,* 46 F.3d 325, 333 n. 14 (3d Cir.), cert. denied, — U.S. —, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995)). Moreover, the FHAA was intended to "require that changes be made to ... traditional rules or practices if necessary to permit a person with handicaps an equal opportunity to use and enjoy a dwelling." *Id.* (quoting H.R.Rep. No. 711, at 25, 1988 U.S.Code Cong. & Admin.News 2186). In light of these pronouncements, dismissal of Samuelson's action would be improper.

▉ It is important to note what this Court has not held. It has not decided the issue of whether Mid–Atlantic has failed to reasonably accommodate Samuelson. Such a fact-intensive inquiry is not suited for the procedural posture of a motion to dismiss. *See California Mobile Home Park,* 29 F.3d at 1418. Rather, the Court holds merely that Samuelson should be given an opportunity to prove at trial that Mid–Atlantic failed to reasonably accommodate him in violation of the FHAA. Given the "broad remedial intent of Congress embodied in the [Fair Housing] Act," *Hovsons, Inc.,* 89 F.3d at 1105 (citation omitted), the Court holds Samuelson has stated a claim upon which relief may be granted for purposes of a Rule 12(b)(6) motion.

---

6. The late charges and fees here are applied to all tenants who terminate their leases early, but a failure to make reasonable accommodations for the handicapped has an equally discriminatory effect. *See* 42 U.S.C. § 3604(f)(3)(B).

### C. Samuelson's State Law Claim: Delaware Landlord Tenant Code [7]

Samuelson has also alleged a violation of the Delaware Landlord Tenant Code. Section 5314(b)(2) allows a tenant to terminate a rental agreement with thirty days' written notice "whenever the serious illness of the tenant ... requires a change in the location of his residence on a permanent basis[.]" DEL.CODE ANN. tit. 25, § 5314(b)(2). Under the Judicial Improvements Act of 1990, this Court has jurisdiction over Samuelson's state law claims.

Section 1367 of the Judicial Improvements Act states the federal courts "shall have supplemental jurisdiction" over claims which are "part of the same case or controversy" as a claim over which the court exercises original jurisdiction. 28 U.S.C. § 1367(a). Both parties have agreed in their briefs that Samuelson's state law claim is part of the same case or controversy as his FHAA claim. Neither party has asserted this case presents a novel issue of state law and the Court sees no exceptional or compelling reason to decline jurisdiction over Samuelson's claim. Thus, the Court will exercise supplemental jurisdiction over Samuelson's state law claim alleging a violation of the Delaware Landlord Tenant Code.

---

**7.** As noted earlier, Samuelson has also alleged a violation of the Delaware Fair Housing Act, a state claim which is subject to the same analysis as his federal claim. See *supra* note 3 and accompanying text.